IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 10x GENOMICS, INC. and PROGNOSYS BIOSCIENCES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. |
| ILLUMINA, INC., | ) ) | **DEMAND FOR JURY TRIAL** |
| Defendant. | ) ) | |

**COMPLAINT**

Plaintiffs 10x Genomics, Inc. ("10x") and Prognosys Biosciences, Inc. ("Prognosys") in their Complaint for patent infringement against Defendant Illumina, Inc. ("Illumina") allege as follows:

**NATURE OF THE ACTION**

1.      This is an action for infringement of U.S. Patent Nos. 11,008,607 (the "607 Patent"), 11,549,138 (the "138 Patent"), 12,234,505 (the "505 Patent"), and 12,297,487 (the "487 Patent") (collectively, the "Asserted Patents"). This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271.

**THE PARTIES**

2.      10x is a Delaware corporation. Its principal place of business is 6230 Stoneridge Mall Road, Pleasanton, CA 94588. 10x is the exclusive licensee of the Asserted Patents.

3.      10x is a pioneering innovator of genomics and sequencing technologies that are providing life science researchers and clinicians an unprecedented understanding of biology. By elegantly combining its proprietary hardware, chemistry, and software, 10x has developed and brought to market award-winning products that give single cell and spatial views of complex

biological systems. 10x's products have enabled previously infeasible forms of research in the life sciences in areas of critical importance to human health, including cancer research, neuroscience, immunology, infectious disease, and developmental biology.

4.      Prognosys is a Delaware corporation. Its principal place of business is 3960 West Point Loma Boulevard, Suite H, PMB 41250, San Diego, CA 92110. Prognosys is the owner and licensor of the Asserted Patents.

5.      On information and belief, Defendant Illumina is a company organized and existing under the laws of the State of Delaware. On information and belief, its principal place of business is in San Diego, California.

6.      On information and belief, Illumina makes, uses, sells, offers to sell, exports, and/or imports into the United States products, services, and components that have been and are used to infringe one or more claims of the Asserted Patents, actively induces infringement by others of the Asserted Patents, and contributes to the infringement by others of the Asserted Patents.

## JURISDICTION AND VENUE

7.      Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

8.      This civil action for patent infringement arises under the patent laws of the United States, 35 U.S.C § 1 *et seq.*, including 35 U.S.C. § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      This Court has personal jurisdiction over Defendant, and venue is proper in this district pursuant to 28 U.S.C. § 1400(b), because Illumina is a Delaware corporation and thus resides in this district.

## BACKGROUND

**A.    10x's Groundbreaking Single Cell and Spatial Transcriptomics Technologies**

10.    10x is a life sciences technology company founded in 2012 in Pleasanton, California by Drs. Serge Saxonov and Benjamin Hindson. Since its inception, 10x has focused on building new technologies to enable breakthrough discoveries and accelerate the understanding of biology. To date, 10x has invested hundreds of thousands of hours and approximately $2 billion in research and development to invent, design, and develop its proprietary line of products for understanding biology at unprecedented resolution and scale. 10x continues to invest significant time and money to further innovate and bring ground-breaking new products and capabilities to market.

11.    In the ten years since its first product launch in 2015, 10x's expanding suite of products has fueled a revolution in genomics, winning wide acclaim and commercial success. 10x has achieved an installed base of more than 7,000 instruments around the world, including at all top 100 global research institutions and all top 20 global biopharmaceutical companies. Annual sales of 10x products exceeded $600 million in 2024. Over 10,000 high-impact scientific articles have been published based on data generated from 10x products, including hundreds of articles in top journals *Cell*, *Science*, and *Nature*. This scientific work illustrates the use of 10x products to discover, for example: molecular mechanisms that lead to brain, breast, and lung cancers; how the immune system reacts to COVID-19 infections; and a new type of lung cell that causes cystic fibrosis. The paradigm-changing nature of 10x's products has led to numerous accolades, including these products being named to *The Scientist* magazine's Top 10 Innovations List in 2015, 2017, 2018, 2019, 2020, and 2021.

12.    Since its launch in 2016, 10x's award-winning Chromium platform has been essential to enabling single cell genomics—the study of gene activity on a cell-by-cell basis. The

3

genetic code contained in a person's DNA inside the nucleus of each cell is transcribed into a nucleic acid called messenger RNA (mRNA), which is then in turn translated into the proteins that implement the cell's biological functions. The full range of mRNA expressed in a cell is known as its "transcriptome." A cell's transcriptome can provide insight into how it is differentiated from other cells and whether it may be cancerous or otherwise disordered. The study of cellular transcriptomes is known as transcriptomics. In contrast to prior techniques, in which genetic material from biological tissue was blended and analyzed in bulk, cell-by-cell analysis preserves the heterogeneity of cells and their transcriptomes within larger biological samples. For example, a cancer tumor can consist of a varied population of cells, some healthy and some cancerous, and the cancerous cells themselves may consist of genetically distinct subpopulations that are susceptible to different therapeutics. Prior techniques for sequencing the genomic make-up of a sample did not preserve this type of complexity, but it can be fully captured using 10x's single-cell analysis solutions such as the Chromium platform. Just two years after 10x launched the Chromium platform, *Science* magazine hailed cell-by-cell developmental analysis as the "2018 Breakthrough of the Year." *See* https://www.science.org/content/article/breakthrough-2018. The Chromium X, which launched in July 2021, enables the expansion of single-cell studies to experiments on the scale of a million cells and was named a Top 10 Innovation in 2021 by *The Scientist* magazine.

13.     10x is also a pioneer in the field of spatial transcriptomics, which facilitates the study of gene activity in cells within their spatial context. Spatial analysis enables researchers and clinicians to not only study the varied genetic make-up of the cells in a sample but also to map where in the tissue the different cells are found. The relationship between cells and their relative locations within a tissue provides insights instrumental to helping scientists gain a better

understanding of biological processes and disease. For instance, in the context of cancer tumors, understanding the arrangement of cells within the tumor allows researchers to interrogate how various cellular structures contribute to tumor development, progression, and metastasis.[1]

14.     In 2018, 10x acquired Spatial Transcriptomics AB, the first company to commercialize a product that captures the transcriptome of a tissue section. A transcriptome is a snapshot of all the RNA transcripts in a cell and provides researchers a broad account of active cellular activity. 10x built upon Spatial Transcriptomics AB's technology and, in 2019, 10x launched its award-winning Visium Platform with the Visium Spatial Gene Expression Solution. 10x's Visium Platform catalyzed the field of spatial analysis by providing the first commercial product to enable true spatial whole transcriptome single-cell analysis.

15.     In 2020, *Nature Methods* named spatially resolved transcriptomics its "Method of the Year" and featured 10x's spatial technology on the cover. *See* Vivien Marx, Method of the Year: spatially resolved transcriptomics, 18 NATURE METHODS 9 (2021). 10x's Visium Spatial Gene Expression Solution was named among *The Scientist* magazine's Top 10 Innovations in 2020. In August 2025, a survey of nearly 200 researchers within the spatial transcriptomics field identified 10x's Visium platform as number one in terms of awareness, usage, and researchers' interest. *See* Andrew P. Han, *Spatial Omics Technology Survey Reveals 'Long Tail' of Interest Across Many Platforms* (August 13, 2025), *available at* https://www.genomeweb.com/gene-expression-rna-sequencing/spatial-omics-technology-survey-reveals-long-tail-interest-across?utm_source=Sailthru&utm_medium=email&utm_campaign=GWDN%20Wed%20PM%202025-08-13&utm_term=GW%20Daily%20News%20Bulletin (last accessed October 16, 2025).

---

[1] R. Arora et al., *Spatial transcriptomics reveals distinct and conserved tumor core and edge architectures that predict survival and targeted therapy response*, 14 NAT. COMMS. 5029 (2023).

16.    10x's Visium Spatial Gene Expression Solution preserves spatial information with spatially barcoded capture probes at known locations. Once captured by the probes, the mRNA undergoes reverse transcription, library construction, and sequencing. *See* Product Sheet, Visium, Visualize gene expression within the tissue context, 2021, available at https://pages.10xgenomics.com/rs/446-PBO-704/images/10x_LIT059_ProductSheet_VisiumSpatialGeneExpression_Letter_digital.pdf.

17.    The sequencing data—which includes the spatially barcoded capture probe sequences—is analyzed using 10x's analysis and visualization software Space Ranger and Loupe Browser. The known locations of the spatial barcode sequences are used to create a spatial transcriptomic map, providing a holistic and visual understanding of gene expression in the tissue. *See id.* The figure below, taken from the above-referenced Visium Product Sheet, *id.* at 2, shows the ready-to-use, robust 10x workflow for whole tissue section analysis.



18.    In 2024, 10x launched Visium HD Spatial Gene Expression. Visium HD represents a significant advancement in spatial transcriptomics, offering whole transcriptome analysis at single cell–scale resolution. The effective resolution of other companies' prior products, by contrast, was approximately 10-20 cells at best. Visium HD accomplishes this by

using a novel slide architecture featuring millions of 2 x 2 μm barcoded squares without gaps, which, in addition to enabling single cell-scale spatial resolution, also enables continuous tissue coverage. The Visium HD product is compatible with human and mouse fresh frozen, fixed frozen, and formalin-fixed paraffin-embedded (FFPE) samples, including archived blocks and pre-sectioned slides. Visium HD has been highlighted in various scientific discussions and institutional resources for its innovative approach to spatial transcriptomics. *See, e.g.*, Visium HD Spatial Transcriptomics, UK College of Arts and Sciences, https://imaging.as.uky.edu/visium-hd-spatial-transcriptomics (last accessed October 16, 2025).

19.     To enable the Visium platform offerings, 10x either owns or licenses foundational intellectual property for performing spatial transcriptomics, developed by the scientists who pioneered the techniques underpinning it. 10x is the exclusive licensee of the "Spatially Encoded Biological Assays" patent family owned by Prognosys Biosciences, Inc. and invented by its former CEO and CSO Mark S. Chee, Ph.D. Dr. Chee is a celebrated leader in the genomics and proteomics field with more than 100 U.S. patents. In 1998, Dr. Chee co-founded Illumina and he was the former Vice President of Genomics at Illumina. He was also the Director of Genetics Research at Affymetrix.

**B.     Illumina's Infringing Spatial Technology Product**

20.     In February 2025, Illumina announced its "spatial technology program" for "whole-transcriptome profiling with cellular resolution and high sensitivity." Illumina Press Release, Illumina unveils first-of-its-kind spatial transcriptomics technology (Feb. 19, 2025), https://www.illumina.com/company/news-center/press-releases/2025/10a7ec49-da37-40d8-8aff-0e8e149b9534.html. Illumina explained that it was collaborating with the Broad Institute and that this collaboration would "offer early access to Illumina's spatial technology to external research groups." *Id.* Illumina also announced that researchers from the Broad Institute, St. Jude

Children's Research Hospital, and TGen would share data on their research using Illumina's spatial product and workflow at the then-upcoming AGBT (Advances in Genome Biology and Technology) General Meeting. *Id.* Illumina also announced that it planned to conduct a Gold Sponsor Workshop at AGBT and planned to demonstrate its end-to-end spatial workflows throughout the AGBT conference.

21.    Illumina and its collaborators presented additional details about the technology at the AGBT General Meeting later that month. At the meeting, Illumina employees presented a poster describing their work. *See* Kareem Ahmad et al., *Illumina based ex-situ whole-transcriptome workflow providing large area capture substrate, up to 7.5 cm² active area, and a scalable end-to-end software solution*, https://emea.illumina.com/content/dam/illumina/gcs/assembled-assets/marketing-literature/agbt-posters-2025/spatial-kidney-agbt-2025-poster-sp-00652.pdf (last accessed October 16, 2025) ("Ahmad *et al.*"). The poster names a number of Illumina employees as authors: Kareem Ahmad, Connor Allen, Joel Sher, Reza Riahi, Erin Sarocco, Andrea Manzo, Sarah Nainar, Angela Nicholson-Shaw, Thu Nguyen, Shaobo Zhang, Asli Yildirim, Samuel Clamons, Sujai Chari, Chris Edlund, Allie Duchnak, Adam White, Tim Merkel, Jeff Fisher, Joachim Schmid, Niranjan Vissa, Bret Langham, Ben Moore, Hean Koon Koay, Darren Segale, Mark Wang, Cande Rogert, and Emily Parker. The poster described the workflow as including ex situ spatial transcriptomics with polyA capture and as being compatible with a variety of fresh frozen tissues. An excerpt of the Illumina poster is included below.



**Figure 3. Assay workflow.**

- *Ex-situ* spatial transcriptomics with polyA capture
- Compatible with a variety of Fresh Frozen tissues

22.    Michal Lipinski, a senior research scientist at the Broad Institute, presented details about the Illumina spatial product and workflow at the AGBT meeting. On information and belief, as shown below, Lipinski explained that the process includes the following steps: (1) capturing mRNA from a tissue, (2) converting the mRNA to cDNA tagged with a location barcode, (3) releasing the spatially tagged cDNA, and (4) sequencing and analyzing the data thereby generating a spatial image. The below slide from Lipinski's presentation at the 2025 AGBT conference shows these steps:



23.     Lipinski further showed a visualization of Illumina's probes contacting a tissue sample:



24.     Since then, Illumina has posted videos of researchers using their spatial technology. *See, e.g.*, Chenchen Zhu (a research scientist at Stanford University), *Cell atlasing human intestine using Illumina spatial technology*, *available at* https://www.illumina.com/company/video-hub/wX_t-ChQkUU.html (last accessed October 16, 2025). Illumina has also added a "Spatial transcriptomics technology" webpage promoting what it calls "Illumina spatial technology." *See* https://www.illumina.com/techniques/sequencing/rna-sequencing/spatial-transcriptomics/technology.html#:~:text=How%20Illumina%20spatial%20technology%20works,to%20large%2Dscale%20research%20projects (last accessed October 16, 2025). The webpage includes the following diagrams depicting its workflows.



*Id.*



*Id.*

25.     On information and belief, Illumina has described aspects of its spatial product and methods in WO2025/145013 (the "013 Publication"), assigned to Illumina. For example, Example 2 of the 013 Publication appears consistent with the Illumina workflow on mouse kidney tissue described publicly by Illumina employees in Ahmad *et al.* Additionally, several of the named inventors on the publication are Illumina employees who are recognized as contributors to the Ahmad, et al. poster presented at AGBT including Jeff Fisher, Andrea Manzo, and Darren Segale. In Example 2, Illumina describes a spatial approach that begins with sections of a mouse kidney mounted onto a substrate containing oligonucleotide probes connected to the substrate by adaptors. *Id.* ¶ 104. In Illumina's disclosures, the mouse kidney tissues were fixed, stained, and dried. *Id.*, ¶ 104. The tissue sections were then permeabilized and incubated in a first strand cDNA synthesis mix containing a TSO. *Id.* (library preparation option 1, corresponding to Figures 1A and 1B). According to the library preparation workflow described in Figures 1A and 1B, the mRNA molecules were then hybridized to oligonucleotides by binding the poly(T) tail of the oligonucleotides on the probe. *See id.*; Fig. 1A. "After tissue permeabilization, RNA diffuses down to the surface and hybridizes to the capture oligonucleotides through its polyA tail. Reverse transcription (RT) is performed using an RT enzyme with terminal transferase activity ( e.g., Maxima H- or Superscript IV) and in the presence of a TSO. The TSO can then hybridize to the untemplated nucleotides at the end of the cDNA molecule, and the RT enzyme will add the complement of the TSO sequence to the end of the cDNA molecule (Figure 1A)." *Id.* ¶ 93. "After reverse transcription, the RNA is denatured or digested away, and the complementary TSO sequence on the cDNA will hybridize to the TSO sequence on the spatially barcoded oligonucleotides. Polymerase extension can then copy the spatially barcoded oligonucleotide sequence onto the cDNA strand, to the region corresponding to the 5' end of the RNA molecule

(Figures 1 A-1 B)." *Id.* ¶ 95. After this, both the tissue and RNA were removed with proprietary removal mixes. *Id.* ¶ 105. The first complementary strands were cleaved off the surface and the second complementary strands were eluted into a PCR tube, neutralized, and combined with the first strands. *Id.* ¶ 107; Figures 4A-B. One round of SPRI purification was performed, indexed primers were appended to 10% of the purified cDNA in a PCR reaction (11 cycles), and then another round of SPRI purification was performed. *Id.* The libraries were then sequenced and the sequencing data was processed using Illumina's spatial software to provide spatial transcriptional profiling data. *Id* ¶¶ 107-108. On information and belief, Illumina's spatial workflow can be performed using a template switch oligo ("TSO") approach as depicted in Figures 1A, 1B, and 4A, reproduced below.



**FIGURE 1A**



FIGURE 1B



FIGURE 4A

26.    Illumina's ongoing activities constitute infringement of the Asserted Patents by Illumina, its customers, and/or its end users. In addition, on information and belief, Illumina intends a broad commercial release of its "spatial technology program" in 2026. *See* Andrew P. Han, Illumina Reveals Spatial Biology Method Offering Transcriptome View of Tissues With Cellular Resolution, GenomeWeb (Feb. 19, 2025), https://www.genomeweb.com/sequencing/illumina-reveals-spatial-biology-method-offering-transcriptome-view-tissues-cellular ("first half of 2026"); Illumina, Illumina unveils first-of-its-kind spatial transcriptomics technology (Feb. 19, 2025),

14

https://www.illumina.com/company/news-center/press-releases/2025/10a7ec49-da37-40d8-8aff-0e8e149b9534.html. On information and belief, while Illumina has started its spatial product with fresh frozen tissues, it intends to release its system work on FFPE (formalin-fixed, paraffin-embedded) tissues in 2026 as well. *See* Illumina, Inc. (ILMN) AGBT Investor Session Conference                                                                         (Transcript), https://s24.q4cdn.com/526396163/files/doc_events/2025/Feb/25/ILMN-AGBT-2025-Investor-Session-Transcript-02-25-2025-vF.pdf (noting that the FFPE version will be "released in probably the '26 sometime"); *see* https://www.illumina.com/techniques/sequencing/rna-sequencing/spatial-transcriptomics/technology.html#accordion-8e27cd0369-item-e9d354ff77 ("The initial version of Illumina spatial technology is optimized for use with fresh-frozen tissue. A version supporting formalin-fixed, paraffin-embedded (FFPE) tissue is in development."). Illumina has already prepared and analyzed tissue samples sent by the Translational Genomics Research Institute (TGen) and St. Jude's Children's Research Hospital, and, in collaboration with the Broad Institute, Illumina is offering outside researchers access to Illumina's spatial product. *See* Andrew P. Han, Illumina Reveals Spatial Biology Method Offering Transcriptome View of Tissues with Cellular Resolution, GenomeWeb (Feb. 19, 2025), https://www.genomeweb.com/sequencing/illumina-reveals-spatial-biology-method-offering-transcriptome-view-tissues-cellular.

27.     On its webpage, in the section "Learn about real-world applications," Illumina embeds several videos confirming that Illumina's Accused Instrumentalities have been used. https://www.illumina.com/techniques/sequencing/rna-sequencing/spatial-transcriptomics/technology.html#:~:text=How%20Illumina%20spatial%20technology%20works,to%20large%2Dscale%20research%20projects. Illumina lists researchers, both from within

Illumina and from other institutions, who have used or are using results obtained from Illumina's spatial technology product. *See id.* These include: Michal Lipinski of The Broad Institute, *id.* at "Whole-transcriptome profiling of large tissue areas" (*see* video at 3:07-4:00 (describing his group's use of "Illumina ST method")); Darren Segale of Illumina, *id.* at "A spatial map of pregnant mouse brains" (*see* video at 0:36-0:40 (stating that "we explore these neurological changes with Illumina's spatial technology platform")); Jasmine Plummer of St. Jude Children's Research Hospital, *id.* at "Spatial sequencing reveals tumor environment changes"; Chenchen Zhu of Stanford University, *id.* at "Cell atlasing human intestine using Illumina spatial solution" (*see* video at 3:30-34 (stating that "we have intestine samples we sent Illumina for profiling")); Nicholas Banovich of Translational Genomics Research Institute, *id.* at "Alveolar dysregulation in pulmonary fibrosis" (*see* video at 0:04-09 ("shar[ing] how we're applying this Illumina spatial technology")).

### C.   The Asserted Patents

28.   The Asserted Patents all claim priority to U.S. patent application No. 13/080,616 (filed Apr. 5, 2011), which itself claims priority to U.S. provisional patent application 61/321,124 (filed on Apr. 5, 2010). The sole inventor of the Asserted Patents is Mark Chee. The patents are all titled "Spatially Encoded Biological Assays." The Asserted Patents are assigned to Prognosys Biosciences, Inc., who gave an exclusive license to 10x.

29.   The Asserted Patents include:

- The 607 Patent (issued May 18, 2021) attached as Exhibit 1;

- The 138 Patent (issued Jan. 10, 2023) attached as Exhibit 2;

- The 505 Patent (issued Feb. 25, 2025) attached as Exhibit 3; and

- The 487 Patent (issued May 13, 2025) attached as Exhibit 4.

16

1.     **The 607 Patent**

30.     Claim 1 is the only independent claim of the 607 Patent and recites:

1. A method of detecting a target mRNA in a tissue sample, comprising:

contacting a tissue sample with a plurality of probes, wherein a probe of the plurality of probes comprises a capture agent that specifically binds a target mRNA of the tissue sample and is coupled to an oligonucleotide comprising a sequence;

generating a nucleic acid molecule comprising all or a portion of the sequence of the oligonucleotide or a complement thereof and one or more nucleic acid tags that can be used to determine a location of the target mRNA in the tissue sample; and

determining all or a portion of a sequence of the nucleic acid molecule or a complement thereof to detect the target mRNA and determine its location in the tissue sample.

31.     Plaintiffs asserted the 607 Patent against NanoString Technologies ("NanoString"). *See 10x Genomics v. NanoString Techs.*, C.A. No. 21-653, D.I. 8 (D. Del. May 19, 2021) (First Amended Complaint). NanoString and its successor Bruker Spatial Biology, Inc. challenged the validity of the 607 Patent, but their challenges were unsuccessful. *See, e.g.*, *10x Genomics, Inc. v. Bruker Spatial Biology, Inc.*, C.A. No. 21-653, 2024 U.S. Dist. LEXIS 231640 (D. Del. Dec. 23, 2024); *10x Genomics, Inc. v. NanoString Techs., Inc.*, 690 F. Supp. 3d 449 (D. Del. 2023); *10x Genomics, Inc. v. NanoString Techs., Inc.*, C.A. No. 21-653, D.I. 44 (D. Del. Jan. 3, 2022). This lawsuit was known in the spatial biology space. *See, e.g.*, U.S. District Court Awards 10x Genomics Permanent Injunction in Patent Infringement Lawsuit Against Bruker Corporation's GeoMx Products, PR Newswire (Dec. 23, 2024), https://www.prnewswire.com/news-releases/us-district-court-awards-10x-genomics-permanent-injunction-in-patent-infringement-lawsuit-against-bruker-corporations-geomx-products-302338627.html; 10x Genomics Wins Another Patent Infringement Case Against NanoString Technologies, PR Newswire (Nov. 17, 2023), https://www.prnewswire.com/news-releases/10x-

genomics-wins-another-patent-infringement-case-against-nanostring-technologies-301992620.html.

32.    The 607 Patent claims are directed to concrete, unconventional laboratory methods for spatial analysis of nucleic acids in a tissue sample by contacting the tissue sample with a plurality of probes comprising a "capture agent" that binds the target nucleic acid to produce tagged nucleic acid molecules not found in nature that now include a coding tag corresponding to a location. The claimed methods then determine all or a portion of the sequence of the coding tag and the nucleic acid (or complements thereof) to determine the presence or abundance of the nucleic acid at a location in the original tissue section. Both the probes and the capture agents are engineered and not found in nature. *E.g.*, 607 Patent at 9:32-48 (discussing synthesis of capture agent probes); *id.* at 24:5-28 (discussing techniques for making the array of capture agents that include binding agents and coding identifiers); *see also id.* at 9:29-31 (disclosing that "[c]oding tags in most embodiments are oligonucleotides" but may also be "mass tags" or "fluorescent labels" which also do not occur in nature).

33.    The combination of elements in the claimed methods of the 607 Patents was not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. As the 607 Patent specification explains, then-existing methods to analyze gene expression did "not enable simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample." 607 Patent at 1:58-61. For example, the specification explains that existing techniques such as "[l]aser capture microdissection has permitted the analysis of many genes at a small number of locations, but it is very expensive, laborious, and does not scale well" and that "[c]ertain PCR assays in a 2D format preserve spatial information . . . but these methods have low spatial resolution because

they rely on physical transference of tissue into wells, which also prevents random access to tissue samples and high levels of multiplexing." 607 Patent at 1:61-2:3. As such, the 607 Patent teaches that "no practical method exists to analyze at high resolution the spatial expression patterns of large numbers of genes, proteins, or other biologically active molecules simultaneously," and there is "thus a need for reproducible, high-resolution spatial maps of biological molecules in tissues." 607 Patent at 2:4-9.

34.     The 607 Patent "addresses this need" by claiming and teaching, *inter alia*, an unconventional way to create new tagged nucleic acid molecules that never existed in nature and that are uniquely well-suited to highly multiplexed detection via next generation sequencing that will still preserve and record the original spatial location information, unlike prior art techniques. *See* 607 Patent at 2:4-9. As the specification explains, it was not conventional to use an array of the claimed capture agents to create tagged nucleic acid complexes across a tissue sample that could then be sequenced in high-throughput, highly multiplexed next generation sequencers while preserving and recording information about the original spatial locations of the nucleic acids. Instead, by providing: an "assay capable of high levels of multiplexing where encoded probes are provided to a biological sample in defined spatial patterns; instrumentation capable of controlled delivery of reagents according to the spatial patterns; and a decoding scheme providing a readout that is digital in nature," (607 Patent at Abstract, 2:26-31), the claimed combination was innovative rather than conventional, and "provides the ability to look at many biological targets in many locations, providing the resolution of in situ hybridization with the highly-parallel data analysis of sequencing." 607 Patent at Abstract, 2:31-34.

35.     The written description of the 607 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations

cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 607 Patent. As the 607 Patent specification explains:

> The assay design of the invention provides an accurate and easily scalable spatial encoding system. The ability to deliver reagents in a spatially defined pattern together with software, reagents and protocols comprises a novel and highly innovative assay system for spatial analysis of various biological molecules and activities. This allows the assays to measure numerous biological functions in a meaningful spatial environment, including functions such as gene expression and peptide localization. The systems provide the potential to open a new analytical window into the complex spatial patterns of cellular function and regulation in biological systems.

607 Patent at 23:25-36.

36.    The claimed methods of the 607 Patent were not routine or conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features. By enabling "simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample," 607 Patent at 1:59-61, the claims are directed to a specific, unconventional innovation in gene expression analysis.

37.    The scientific community's response to the inventions claimed in the 607 Patent confirm the unconventional and inventive nature of the claims. The earliest response from the scientific community to the claimed improvements came from the review panels assigned to inventor Dr. Mark Chee's grant proposals to begin work on first embodiments.

38.    On April 5, 2010, Dr. Chee applied for a Phase 1 NIH grant, describing his view of the unmet needs in the field. *See* Exhibit 9. As part of his application, Dr. Chee again articulated his vision of the unmet need for a new solution (*id.* at 40):

Gene expression analysis is a powerful approach for obtaining insights into how cells and tissues function at the molecular level. Breakthrough technologies for detecting and quantitating RNA species on a genome-wide scale including microarrays and next-generation sequencing. However, these methods do not enable analysis *in situ*, and so valuable information on spatial organization of gene expression is lost. Laser capture microdissection and other precise sampling methods have permitted the spatial analysis of many genes at a small number of locations, but this approach is expensive, laborious, and difficult to scale to many samples. Similarly, *in situ* hybridization can provide exquisite spatial detail but is difficult to scale to many genes. Thus, there is a major unmet need for a novel technology that enables the expression of many genes to be assayed at many locations simultaneously. Such a technology would reveal at much higher resolution the orchestration of gene expression in complex tissues, and thus has the potential to provide new insights into the functioning and regulation of complex biological systems.

We have conceived a novel spatially encoded assay technology, *Spatially Encoded Genomically Addressed* (SEGA) assays, that is designed to address this need.

Dr. Chee also echoes the statements from his invention disclosure that no practical solution yet existed. *See id.* at 41.

39.    The scientific review group (Center for Scientific Review Special Emphasis Panel Small Business: Genes, Genomics, and Genetics) that reviewed Dr. Chee's 2010 grant application on July 23, 2010 (Exhibit 10),

unanimously recognize[d] that the proposed technology is highly innovative, addresses a significant need, holds a great commercial potential and, if successfully implemented, could provide a quantum leap in the field of multiplexed gene expression analysis.

*Id.* at 2. The panel further observed (*Id.* at 4):

- "This is [an] innovative proposal that addresses a critical need, namely high throughput gene expression profiling that preserves spatial information, that is currently not addressed by any existing technology

- The approach is both elegant and simple in its conception

- The system incorporates state of the art technologies and DNA sequencing

- The approach to solving major technical challenges is systematic and methodical

- Milestones are realistic and results will be validated against existing 'gold standard' assays."

The panel awarded this Phase 1 grant an overall impact score of 18, a high score on the NIH's scale that ranges from 10 (highest) to 90 (lowest), far exceeding the threshold for meritorious funding. *See, e.g.,* https://www.nlm.nih.gov/ep/FAQScores.html.

40.    Dependent claims of the 607 Patent are further directed to specific, unconventional improvements to spatial analysis. These additional unconventional combinations of method steps include separating unbound probes that do not interact with the target mRNA from the tissue sample (Claim 2), and obtaining an image of the tissue sample and determining a region of interest for analysis in the tissue sample based on the image (Claim 6).

### 2.    The 138 Patent

41.    Claims 1 and 17 are the only independent claims of the 138 Patent and recite:

1. A composition comprising an array comprising a substrate and a plurality of capture probes, wherein:

each of the plurality of capture probes comprises: (i) a target-binding domain, (ii) a nucleic acid sequence that identifies a unique location on the substrate and is not configured to hybridize to a nucleic acid that binds to the target-binding domain, and (iii) a primer binding site;

the target-binding domain of each of the plurality of capture probes comprises a nucleic acid sequence that is complementary to at least a portion of the nucleic acid that binds to the target-binding domain; and

each of the plurality of capture probes are immobilized on the substrate in a random pattern.

17. A composition comprising (i) an array comprising a substrate and a plurality of capture probes, and (ii) a tissue section, wherein:

the tissue section is disposed on the array;

each of the plurality of capture probes comprises: (i) a target-binding domain (ii) a nucleic acid sequence that identifies a unique location on the substrate and is not configured to hybridize to a nucleic acid that binds to the target-binding domain, and (iii) a primer binding site;

the target-binding domain of each of the plurality of capture probes comprises a nucleic acid sequence complementary to at least a portion of the nucleic acid that binds to the target-binding domain; and

each of the plurality of capture probes are immobilized on the substrate in a random pattern.

42.    Plaintiffs asserted and continue to assert the 138 Patent against Curio Bioscience, Inc., Takara Bio USA, Inc., and Takara Bio USA Holdings, Inc. *See 10x Genomics, Inc. and Prognosys Biosciences Inc. v. Curio Bioscience, Inc.*, *et al*, C.A. No. 23-1375, D.I. 1 (D. Del. Dec. 1, 2023) (Complaint). This lawsuit was known in the spatial biology space. *See, e.g.*, Andrew P. Han, 10x Genomics Sues Curio Bioscience, Alleging Infringement of Spatial Biology Patents, GenomeWeb (Dec. 4, 2023), https://www.genomeweb.com/business-news/10x-genomics-sues-curio-bioscience-alleging-infringement-spatial-biology-patents; Blake Brittain, *10x Genomics sues rival Curio over gene-sequencing technology*, Reuters (Dec. 4, 2023), https://www.reuters.com/legal/litigation/10x-genomics-sues-rival-curio-over-gene-sequencing-technology-2023-12-04/. Curio Bioscience filed an *inter partes* review ("IPR") to challenge the validity of the 138 Patent, and the Patent Trial and Appeal Board (PTAB) denied institution of this IPR, holding that Curio has not demonstrated a reasonable likelihood of success in proving that at least one claim of the 138 Patent is unpatentable. *See Curio Bioscience, Inc. v. Prognosys Biosciences Inc. and 10x Genomics, Inc.*, IPR2025-00192, Paper 8 (May 21, 2025).

43.    The 138 Patent claims are directed to concrete, unconventional laboratory compositions for use in spatial analysis of nucleic acids in a tissue sample by contacting the tissue sample with an "array" comprising a substrate and "capture probes" that bind the target nucleic acid to produce tagged nucleic acid molecules not found in nature that now include a coding tag corresponding to a location. The claimed composition can be used to determine all or a portion of the sequence of the coding tag and the nucleic acid (or complements thereof) to

determine the presence or abundance of the nucleic acid at a location in the original tissue section. The capture probes are engineered and not found in nature. *E.g.*, 138 Patent at 9:33-49 (discussing synthesis of capture agent probes); *id.* at 24:14-37 (discussing techniques for making the array of capture agents that include binding agents and coding identifiers); *see also id.* at 9:30-32 (disclosing that "[c]oding tags in most embodiments are oligonucleotides" but may also be "mass tags" or "fluorescent labels" which also do not occur in nature).

44.    The claimed combination in the 138 Patent were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. As the 138 Patent specification explains, then-existing methods to analyze gene expression did "not enable simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample." 138 Patent at 1:59-62. For example, the specification explains that existing techniques such as "[l]aser capture microdissection has permitted the analysis of many genes at a small number of locations, but it is very expensive, laborious, and does not scale well" and that "[c]ertain PCR assays in a 2D format preserve spatial information . . . but these methods have low spatial resolution because they rely on physical transference of tissue into wells, which also prevents random access to tissue samples and high levels of multiplexing." 138 Patent at 1:62-2:4. As such, the 138 Patent teaches that "no practical method exists to analyze at high resolution the spatial expression patterns of large numbers of genes, proteins, or other biologically active molecules simultaneously," and there is "thus a need for reproducible, high-resolution spatial maps of biological molecules in tissues." 138 Patent at 2:5-10.

45.    The 138 Patent "addresses this need" by claiming and teaching, *inter alia*, an unconventional composition of new tagged nucleic acid molecules that never existed in nature

and that are uniquely well-suited to highly multiplexed detection via next generation sequencing that will still preserve and record the original spatial location information, unlike prior art techniques. *See* 138 Patent at 2:5-10. As the specification explains, it was not conventional to use an array of the claimed capture probes to create tagged nucleic acid complexes across a tissue sample that could then be sequenced in high-throughput, highly multiplexed next generation sequencers while preserving and recording information about the original spatial locations of the nucleic acids. Instead, by providing: an "assay capable of high levels of multiplexing where encoded probes are provided to a biological sample in defined spatial patterns; instrumentation capable of controlled delivery of reagents according to the spatial patterns; and a decoding scheme providing a readout that is digital in nature," (138 Patent at Abstract, 2:26-31), the claimed combination was innovative rather than conventional, and "provides the ability to look at many biological targets in many locations, providing the resolution of in situ hybridization with the highly-parallel data analysis of sequencing." 138 Patent at Abstract, 2:32-34.

46.    The written description of the 138 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry prior to the inventions of the 138 Patent. As the 138 Patent specification explains:

> The assay design of the invention provides an accurate and easily scalable spatial encoding system. The ability to deliver reagents in a spatially defined pattern together with software, reagents and protocols comprises a novel and highly innovative assay system for spatial analysis of various biological molecules and activities. This allows the assays to measure numerous biological functions in a meaningful spatial environment, including functions such as gene expression and peptide localization. The systems provide the potential to open a new analytical window into the complex spatial patterns of cellular function and regulation in

biological systems.

138 Patent at 23:34-45.

47.     The claimed combinations of the 138 Patent were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The compositions covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features. By enabling "simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample," 138 Patent at 1:59-62, the claims are directed to a specific, unconventional innovation in gene expression analysis.

48.     The scientific community's response to the inventions claimed in the 138 Patent confirm the unconventional and inventive nature of the claims, as discussed above in connection with the 607 Patent.

49.     Dependent claims of the 138 Patent are further directed to specific, unconventional improvements to spatial analysis. These additional unconventional combinations include attaching each of the plurality of capture probes to a plurality of beads, which are then attached to the substrate (Claim 6), and including at least 1,000 capture probes within each bead (Claim 7).

### 3.    The 505 Patent

50.     Claim 1 is the only independent claim of the 505 Patent and recites:

1. A method of determining spatial distribution of target biological molecules in a tissue sample, comprising:

(a) providing the tissue sample comprising the target biological molecules;

(b) allowing the target biological molecules to interact with nucleic acid probes;

(c) coupling encoded oligonucleotides to the nucleic acid probes, wherein the encoded oligonucleotides are arranged according to a known spatial pattern;

(d) determining sequences of the encoded oligonucleotides coupled to the nucleic acid probes; and

(e) mapping the target biological molecules to locations in the tissue sample using the sequences of the encoded oligonucleotides.

51.    The 505 Patent claims are directed to concrete, unconventional methods for spatial analysis of target biological molecules in a tissue sample by allowing target biological molecules to interact with nucleic acid probes, encoding oligonucleotides that are arranged according to a known spatial pattern are coupled to the probes, determining the sequence of the encoded oligonucleotides, and mapping the target biological molecules to locations in the tissue sample. The probes are engineered and not found in nature. *E.g.*, 505 Patent at 9:41-57 (discussing synthesis of capture agent probes); *id.* at 24:30-54 (discussing techniques for making the array of capture agents that include binding agents and coding identifiers); *see also id.* at 9:38-40 (disclosing that "[c]oding tags in most embodiments are oligonucleotides" but may also be "mass tags" or "fluorescent labels" which also do not occur in nature).

52.    The combination of elements in the claimed method in the 505 Patent was not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. As the 505 Patent specification explains, then-existing methods to analyze gene expression did "not enable simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample." 505 Patent at 2:1-4. For example, the specification explains that existing techniques such as "[l]aser capture microdissection has permitted the analysis of many genes at a small number of locations, but it is very expensive, laborious, and does not scale well" and that "[c]ertain PCR assays in a 2D format preserve spatial information . . . but these methods have low spatial resolution because they rely on physical transference of tissue into wells, which also prevents random access to tissue samples and high levels of multiplexing." 505 Patent at 2:4-13. As such, the 505 Patent

teaches that "no practical method exists to analyze at high resolution the spatial expression patterns of large numbers of genes, proteins, or other biologically active molecules simultaneously," and there is "thus a need for reproducible, high-resolution spatial maps of biological molecules in tissues." 505 Patent at 2:14-19.

53.     The 505 Patent "addresses this need" by claiming and teaching, *inter alia*, an unconventional way to create new tagged nucleic acid molecules that never existed in nature and that are uniquely well-suited to highly multiplexed detection via next generation sequencing that will still preserve and record the original spatial location information, unlike prior art techniques. *See* 505 Patent at 2:14-19. As the specification explains, it was not conventional to use the claimed capture agents to create tagged nucleic acid complexes across a tissue sample that could then be sequenced in high-throughput, highly multiplexed next generation sequencers while preserving and recording information about the original spatial locations of the nucleic acids. Instead, by providing: an "assay capable of high levels of multiplexing where encoded probes are provided to a biological sample in defined spatial patterns; instrumentation capable of controlled delivery of reagents according to the spatial patterns; and a decoding scheme providing a readout that is digital in nature," (505 Patent at Abstract, 2:35-40), the claimed combination was innovative rather than conventional, and "provides the ability to look at many biological targets in many locations, providing the resolution of in situ hybridization with the highly-parallel data analysis of sequencing." 505 Patent at Abstract, 2:41-43.

54.     The written description of the 505 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been

performed in the industry prior to the inventions of the 505 Patent. As the 505 Patent

specification explains:

> The assay design of the invention provides an accurate and easily scalable spatial
> encoding system. The ability to deliver reagents in a spatially defined pattern
> together with software, reagents and protocols comprises a novel and highly
> innovative assay system for spatial analysis of various biological molecules and
> activities. This allows the assays to measure numerous biological functions in a
> meaningful spatial environment, including functions such as gene expression and
> peptide localization. The systems provide the potential to open a new analytical
> window into the complex spatial patterns of cellular function and regulation in
> biological systems.

505 Patent at 23:51-60.

55.    These combination of elements in the claimed methods were not well-understood,

routine, or conventional to one of ordinary skill in the art at the time of the invention. The

methods covered by the asserted claims, therefore, differ markedly from the prior systems in use

at the time of this invention, which, *inter alia*, lacked these features. By enabling "simultaneous

measurement of the expression of many genes or the presence and/or activity of multiple proteins

at many spatial locations in a sample," 505 Patent at 2:2-4, the claims are directed to a specific,

unconventional innovation in gene expression analysis.

56.    The scientific community's response to the inventions claimed in the 505 Patent

confirm the unconventional and inventive nature of the claims, as discussed above in connection

with the 607 Patent.

57.    Dependent claims of the 505 Patent are further directed to specific,

unconventional improvements to spatial analysis. These additional unconventional methods

include immobilizing oligonucleotides directly or indirectly on a substrate (Claim 15), and using

next-generation sequencing for determining the sequence of the encoded oligonucleotides

coupled to the nucleic acid probes in Claim 14.

### 4.    The 487 Patent

58.    Claims 1 and 17 are the only independent claims of the 487 Patent and recite:

1. A composition comprising:

(i) a substrate and a plurality of capture probes, and

(ii) a tissue section, wherein the tissue section is disposed on the substrate, and each of the plurality of capture probes comprises:

> (a) a target-binding domain that comprises a nucleic acid sequence that is configured to bind to at least a portion of a nucleic acid that binds to the target- binding domain;

> (b) a nucleic acid sequence that identifies a location on the substrate and is not configured to hybridize to the nucleic acid that binds to the target-binding domain, and

> (c) a primer binding site.

17. A composition for spatial analysis comprising:

(i) a flow cell comprising a substrate having a plurality of wells, and

(ii) a plurality of capture probes immobilized in the wells of the substrate, wherein each of the plurality of capture probes comprises:

> (a) a target-binding domain that comprises a nucleic acid sequence that is configured to bind to at least a portion of a nucleic acid that binds to the target-binding domain;

> (b) a nucleic acid sequence that identifies a location of the capture probe on the substrate and is not configured to hybridize to the nucleic acid that binds to the target-binding domain, and

> (c) a primer binding site.

59.    The 487 Patent claims are directed to concrete, unconventional laboratory compositions for use in spatial analysis of nucleic acids in a tissue sample by contacting the tissue sample with a "plurality of capture probes" that bind the target nucleic acid to produce tagged nucleic acid molecules not found in nature that now include a coding tag corresponding to a location. The claimed composition can be used to determine all or a portion of the sequence of

the coding tag and the nucleic acid (or complements thereof) to determine the presence or abundance of the nucleic acid at a location in the original tissue section. The capture probes are engineered and not found in nature. *E.g.*, 487 Patent at 9:43-59 (discussing synthesis of capture agent probes); *id.* at 24:19-42 (discussing techniques for making the array of capture agents that include binding agents and coding identifiers); *see also id.* at 9:40-42 (disclosing that "[c]oding tags in most embodiments are oligonucleotides" but may also be "mass tags" or "fluorescent labels" which also do not occur in nature). Claim 17 further recites that the composition includes a "flow cell comprising a substrate having a plurality of wells," which the 487 Patent explains can be "configured to deliver reagents only to certain portions of the biological sample, restricting the amount and type of reagent delivered to any specific section of the biological sample." *Id.* at 17:4-7.

60.    The claimed combinations of the 487 Patent were not well-understood, routine or conventional to one of ordinary skill in the art at the time of the invention. As the 487 Patent specification explains, then-existing methods to analyze gene expression did "not enable simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample." 487 Patent at 2:3-6. For example, the specification explains that existing techniques such as "[l]aser capture microdissection has permitted the analysis of many genes at a small number of locations, but it is very expensive, laborious, and does not scale well" and that "[c]ertain PCR assays in a 2D format preserve spatial information . . . but these methods have low spatial resolution because they rely on physical transference of tissue into wells, which also prevents random access to tissue samples and high levels of multiplexing." 487 Patent at 2:6-15. As such, the 487 Patent teaches that "no practical method exists to analyze at high resolution the spatial expression patterns of large

numbers of genes, proteins, or other biologically active molecules simultaneously," and there is "thus a need for reproducible, high-resolution spatial maps of biological molecules in tissues." 487 Patent at 2:16-21.

61.    The 487 Patent "addresses this need" by claiming and teaching, *inter alia*, an unconventional composition of new tagged nucleic acid molecules that never existed in nature and that are uniquely well-suited to highly multiplexed detection via next generation sequencing that will still preserve and record the original spatial location information, unlike prior art techniques. *See* 487 Patent at 2:16-21. As the specification explains, it was not conventional to use the claimed capture probes to create tagged nucleic acid complexes across a tissue sample that could then be sequenced in high-throughput, highly multiplexed next generation sequencers while preserving and recording information about the original spatial locations of the nucleic acids. Instead, by providing: an "assay capable of high levels of multiplexing where encoded probes are provided to a biological sample in defined spatial patterns; instrumentation capable of controlled delivery of reagents according to the spatial patterns; and a decoding scheme providing a readout that is digital in nature," (487 Patent at Abstract, 2:37-42), the claimed combination was innovative rather than conventional, and "provides the ability to look at many biological targets in many locations, providing the resolution of in situ hybridization with the highly-parallel data analysis of sequencing." 487 Patent at Abstract, 2:42-45.

62.    The written description of the 487 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed, and also understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been

performed in the industry prior to the inventions of the 487 Patent. As the 487 Patent specification explains:

> The assay design of the invention provides an accurate and easily scalable spatial encoding system. The ability to deliver reagents in a spatially defined pattern together with software, reagents and protocols comprises a novel and highly innovative assay system for spatial analysis of various biological molecules and activities. This allows the assays to measure numerous biological functions in a meaningful spatial environment, including functions such as gene expression and peptide localization. The systems provide the potential to open a new analytical window into the complex spatial patterns of cellular function and regulation in biological systems.

487 Patent at 23:39-50.

63.    The claimed combinations were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. The compositions covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features. By enabling "simultaneous measurement of the expression of many genes or the presence and/or activity of multiple proteins at many spatial locations in a sample," 487 Patent at 2:3-6, the claims are directed to a specific, unconventional innovation in gene expression analysis.

64.    The scientific community's response to the inventions claimed in the 487 Patent confirm the unconventional and inventive nature of the claims, as discussed above in connection with the 607 Patent.

65.    Dependent claims of the 487 Patent are further directed to specific, unconventional improvements to spatial analysis. These additional unconventional combinations include providing in the composition "an open gasket that surrounds the tissue section" (Claim 14), attaching the capture probes to a substrate by a 5' end (Claim 15), and depositing reagents to the tissue section (Claim 16).

## COUNT I: Infringement of the 607 Patent

66.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

67.    The 607 Patent issued on May 18, 2021, to Prognosys Biosciences, Inc.

68.    Prognosys is the sole legal owner of the 607 Patent. A true and correct copy of the assignment abstract and record of the 607 Patent is attached as Exhibit 5. 10x is the exclusive licensee of the 607 Patent, including *inter alia* the right to sue Illumina for its acts of infringement and to recover damages therefrom.

69.    Illumina has directly infringed and continues to directly infringe one or more claims of the 607 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with Illumina's spatial products and/or components thereof. Attachment A provides an exemplary infringement claim chart for one asserted claim of the 607 Patent.

70.    Discovery is expected to show how Illumina, its customers (such as the Broad Institute and TGen), and/or its end users perform the claimed steps of the 607 Patent in conjunction with Illumina's spatial products. Plaintiffs plead in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2) that direct infringement occurs in one or more of the following ways:

    A.    Illumina itself performs all the steps recited in one or more claims of the 607 Patent either literally or under the doctrine of equivalents. Thus, Illumina directly infringes one or more claims of the 607 Patent.

    B.    Illumina together with a customer perform all the steps recited in one or more claims of the 607 Patent either literally or under the doctrine of equivalents. The

relationship between Illumina and its customer constitutes a joint enterprise, and they therefore both directly infringe one or more claims of the 607 Patent either literally or under the doctrine of equivalents. For example, Illumina and the Broad Institute are "collaborat[ing]" to perform spatial analysis (https://www.illumina.com/company/news-center/press-releases/2025/10a7ec49-da37-40d8-8aff-0e8e149b9534.html), and this is part of their joint enterprise.

C.    Illumina either performs steps recited in one or more claims of the 607 Patent or it directs its customers and/or end users to perform those steps. Thus, Illumina directly infringes one or more claims of the 607 Patent.

D.    Illumina performs some of the steps recited in one or more claims of the 607 Patent either literally or under the doctrine of equivalents while its customers and/or end users perform the remaining steps recited in that same claim either literally or under the doctrine of equivalents. Illumina conditions the benefit of providing a spatial transcriptomic map to its customers and/or end users on the customers and/or end users performing the remaining steps as claimed. Thus, Illumina directly infringes one or more claims of the 607 Patent.

71.    Illumina is and has been aware of the 607 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 607 Patent. First, beginning in 2015, Illumina communicated with Prognosys regarding a potential license to patent rights within the family of the Asserted Patents. However, Illumina then failed to license any of these patent rights now asserted against it. Second, Plaintiffs successfully asserted the 607 Patent from the same patent family against NanoString Technologies and its successor Bruker Spatial Biology. This lawsuit was widely known in the spatial biology space. *See, e.g.*, U.S. District

Court Awards 10x Genomics Permanent Injunction in Patent Infringement Lawsuit Against Bruker Corporation's GeoMx Products, PR Newswire (Dec. 23, 2024), https://www.prnewswire.com/news-releases/us-district-court-awards-10x-genomics-permanent-injunction-in-patent-infringement-lawsuit-against-bruker-corporations-geomx-products-302338627.html; 10x Genomics Wins Another Patent Infringement Case Against NanoString Technologies, PR Newswire (Nov. 17, 2023), https://www.prnewswire.com/news-releases/10x-genomics-wins-another-patent-infringement-case-against-nanostring-technologies-301992620.html. On information and belief, Illumina monitors patents and patent litigation events in areas of its own interests, and it did so here. Third, the Patent and Trademark Office relied on the parent application of the 607 Patent (which published as U.S. Patent Pub. No. 2011/0245111) as a basis for initially rejecting Illumina's claims that ultimately issued as U.S. Patent No. 10,913,975 as anticipated and obvious. *See* Exhibit 11 (Excerpts of the file history of U.S. Pat. App. No. 15/747,670) at 7 (Non-Final Action at 6 (Sept. 16, 2019) (anticipation)); *id.* at 9-10 (Non-Final Action at 8–9 (obviousness)); *id.* at 18-19 (Final Action at 6–7 (Mar. 2, 2020) (obviousness)). In its responses, Illumina amended its claims to avoid Prognosys's application. *See id.* at 25-31 (Remarks (Jan. 9, 2020)); *id.* at 32-41 (Remarks (May 28, 2020)). Finally, Illumina has been aware of the 607 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 607 Patent and its infringement, and at least since the filing and service of this Complaint.

72.     Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 607 Patent under 35 U.S.C. § 271(b) by making and selling Illumina's spatial products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including

36

Illumina's customers (including, for example, the Broad Institute) and/or end users such as scientists working in laboratories that purchase Illumina's spatial products and/or components thereof, to use Illumina's spatial products and/or components thereof in the United States in a manner that infringes one or more claims of the 607 Patent. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 607 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of Illumina's spatial products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 607 Patent by using Illumina's spatial products and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization.

73.    Discovery is expected to show how Illumina, its customers (such as the Broad Institute and TGen), and/or its end users perform the claimed steps of the 607 Patent in conjunction with Illumina's spatial products. Plaintiffs plead in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2) that direct infringement by Illumina customers and/or end users occurs in one or more of the following ways:

A.    An Illumina customer, by itself, performs all the recited steps of the method for determining the presence or absence of a nucleic acid at a location in a tissue as recited either literally or under the doctrine of equivalents. Thus, Illumina's customer directly infringes and, for the reasons explained above, Illumina actively induces infringement of one or more claims of the 607 Patent.

B.    An Illumina customer performs some of the recited steps of the method for

determining the presence or absence of a nucleic acid at a location in a tissue while Illumina performs the others. The customer conditions benefits—including but not limited to financial benefits—on Illumina performing the remaining steps as claimed. Thus, Illumina's customer directly infringes and, for the reasons explained above, Illumina actively induces infringement of one or more claims of the 607 Patent.

C. An Illumina customer performs some of the recited steps of the method for determining the presence or absence of a nucleic acid at a location in a tissue while Illumina performs the others. Illumina is contractually obligated to perform those steps. Thus, Illumina's customer directly infringes and, for the reasons explained above, Illumina actively induces infringement of one or more claims of the 607 Patent.

74.    Illumina has contributed and continues to contribute to the infringement of one or more claims of the 607 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell Illumina's spatial products and/or components thereof within the United States for use by its customers (including, for example, the Broad Institute) and/or end users knowing that Illumina's spatial products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 607 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of Illumina's spatial products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or users of Illumina's spatial products and/or components thereof, directly infringe the asserted

claims of the 607 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

75.    Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 607 Patent.

76.    The infringement of the 607 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 607 Patent. Such conduct constitutes, at minimum, willful infringement of the 607 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

77.    Unless Illumina is enjoined from infringing the 607 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell its spatial products and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT II: Infringement of the 138 Patent

78.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

79.    The 138 Patent issued on January 10, 2023, to Prognosys Biosciences, Inc.

80.    Prognosys is the sole legal owner of the 138 Patent. A true and correct copy of the assignment abstract and record of the 138 Patent is attached as Exhibit 6. 10x is the exclusive licensee of the 138 Patent, including *inter alia* the right to sue Illumina for its acts of infringement and to recover damages therefrom.

81.    Illumina has infringed and continues to infringe one or more claims of the 138 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority

Illumina's spatial products and/or components thereof. Attachment B provides an exemplary infringement claim chart for one asserted claim of the 138 Patent.

82.     Illumina is and has been aware of the 138 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 138 Patent. First, beginning in 2015, Illumina communicated with Prognosys regarding a potential license to patent rights within the family of the Asserted Patents. However, Illumina then failed to license any of these patent rights now asserted against it. Second, Plaintiffs have also engaged in prior litigation with Curio Bioscience, Inc. over this patent, in a case that was well-publicized in the industry. *See, e.g.*, Andrew P. Han, 10x Genomics Sues Curio Bioscience, Alleging Infringement of Spatial Biology Patents, GenomeWeb (Dec. 4, 2023) https://www.genomeweb.com/business-news/10x-genomics-sues-curio-bioscience-alleging-infringement-spatial-biology-patents; Blake Brittain, *10x Genomics sues rival Curio over gene-sequencing technology*, Reuters (Dec. 4, 2023) https://www.reuters.com/legal/litigation/10x-genomics-sues-rival-curio-over-gene-sequencing-technology-2023-12-04/. Similarly, Plaintiffs successfully asserted the 607 Patent from the same patent family against NanoString Technologies and its successor Bruker Spatial Biology. This lawsuit was similarly widely known in the spatial biology space. *See, e.g.*, U.S. District Court Awards 10x Genomics Permanent Injunction in Patent Infringement Lawsuit Against Bruker Corporation's GeoMx Products, PR Newswire (Dec. 23, 2024), https://www.prnewswire.com/news-releases/us-district-court-awards-10x-genomics-permanent-injunction-in-patent-infringement-lawsuit-against-bruker-corporations-geomx-products-302338627.html; 10x Genomics Wins Another Patent Infringement Case Against NanoString Technologies, PR Newswire (Nov. 17, 2023), https://www.prnewswire.com/news-releases/10x-genomics-wins-another-patent-infringement-case-against-nanostring-technologies-

301992620.html. On information and belief, Illumina monitors patents and patent litigation events in areas of its own interests, and it did so here. Third, the Patent and Trademark Office relied on the parent application of the 138 Patent (which published as U.S. Patent Pub. No. 2011/0245111) as a basis for initially rejecting Illumina's claims that ultimately issued as U.S. Patent No. 10,913,975 as anticipated and obvious. *See* Exhibit 11 (Excerpts of the file history of U.S. Pat. App. No. 15/747,670) at 7 (Non-Final Action at 6 (Sept. 16, 2019) (anticipation)); *id.* at 9-10 (Non-Final Action at 8–9 (obviousness)); *id.* at 18-19 (Final Action at 6–7 (Mar. 2, 2020) (obviousness)). In its responses, Illumina amended its claims to avoid Prognosys's application. *See id.* at 25-31 (Remarks (Jan. 9, 2020)); *id.* at 32-41 (Remarks (May 28, 2020)). Finally, Illumina has been aware of the 138 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 138 Patent and its infringement, and at least since the filing and service of this Complaint.

83. Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 138 Patent under 35 U.S.C. § 271(b) by making and selling Illumina's spatial products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers (including, for example, the Broad Institute) and/or end users such as scientists working in laboratories that purchase Illumina's spatial products and/or components thereof, to use Illumina's spatial products and/or components thereof in the United States in a manner that infringes one or more claims of the 138 Patent. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 138 Patent by those customers and/or end users. One or more of Illumina's

customers and/or end users of Illumina's spatial products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 138 Patent by making and/or using infringing compositions in conjunction with Illumina's spatial products and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization.

84.     Illumina has contributed and continues to contribute to the infringement of one or more claims of the 138 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell Illumina's spatial products and/or components thereof within the United States for use by its customers (including, for example, the Broad Institute) and/or end users knowing that Illumina's spatial products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 138 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of Illumina's spatial products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or users of Illumina's spatial products and/or components thereof, directly infringe the asserted claims of the 138 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

85.     Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 138 Patent.

86.     The infringement of the 138 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina

knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 138 Patent. Such conduct constitutes, at minimum, willful infringement of the 138 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

87.    Unless Illumina is enjoined from infringing the 138 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell its spatial products and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT III: Infringement of the 505 Patent

88.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

89.    The 505 Patent issued on February 25, 2025, to Prognosys Biosciences, Inc.

90.    Prognosys is the sole legal owner of the 505 Patent. A true and correct copy of the assignment abstract and record of the 505 Patent is attached as Exhibit 7. 10x is the exclusive licensee of the 505 Patent, including *inter alia* the right to sue Illumina for its acts of infringement and to recover damages therefrom.

91.    Illumina has infringed and continues to infringe one or more claims of the 505 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority Illumina's spatial products and/or components thereof. Attachment C provides an exemplary infringement claim chart for one asserted claim of the 505 Patent.

92.    Discovery is expected to show how Illumina, its customers (such as the Broad Institute and TGen), and/or its end users perform the claimed steps of the 505 Patent in conjunction with Illumina's spatial products. Plaintiffs plead in the alternative pursuant to

Federal Rule of Civil Procedure 8(d)(2) that direct infringement occurs in one or more of the following ways:

A. Illumina itself performs all the steps recited in one or more claims of the 505 Patent either literally or under the doctrine of equivalents. Thus, Illumina directly infringes one or more claims of the 505 Patent.

B. Illumina together with a customer perform all the steps recited in one or more claims of the 505 Patent either literally or under the doctrine of equivalents. The relationship between Illumina and its customer constitutes a joint enterprise, and they therefore both directly infringe one or more claims of the 505 Patent either literally or under the doctrine of equivalents. For example, Illumina and the Broad Institute are "collaborat[ing]" to perform spatial analysis (https://www.illumina.com/company/news-center/press-releases/2025/10a7ec49-da37-40d8-8aff-0e8e149b9534.html), and this is part of their joint enterprise.

C. Illumina either performs steps recited in one or more claims of the 505 Patent or it directs its customers and/or end users to perform those steps. Thus, Illumina directly infringes one or more claims of the 505 Patent.

D. Illumina performs some of the steps recited in one or more claims of the 505 Patent either literally or under the doctrine of equivalents while its customers and/or end users perform the remaining steps recited in that same claim either literally or under the doctrine of equivalents. Illumina conditions the benefit of providing a spatial transcriptomic map to its customers and/or end users on the customers and/or end users performing the remaining steps as claimed. Thus, Illumina directly infringes one or more claims of the 505 Patent.

93.     Illumina is and has been aware of the 505 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 505 Patent. First, beginning in 2015, Illumina communicated with Prognosys regarding a potential license to patent rights within the family of the Asserted Patents. However, Illumina then failed to license any of these patent rights now asserted against it. Second, Plaintiffs have also engaged in prior litigation with Curio Bioscience, Inc. over patents in this family, in a case that was well-publicized in the industry. *See, e.g.*, Andrew P. Han, 10x Genomics Sues Curio Bioscience, Alleging Infringement of Spatial Biology Patents, GenomeWeb (Dec. 4, 2023), https://www.genomeweb.com/business-news/10x-genomics-sues-curio-bioscience-alleging-infringement-spatial-biology-patents; Blake Brittain, *10x Genomics sues rival Curio over gene-sequencing technology*, Reuters (Dec. 4, 2023) https://www.reuters.com/legal/litigation/10x-genomics-sues-rival-curio-over-gene-sequencing-technology-2023-12-04/. Similarly, Plaintiffs successfully asserted the 607 Patent from the same patent family against NanoString Technologies and its successor Bruker Spatial Biology. This lawsuit was similarly widely known in the spatial biology space. *See, e.g.*, U.S. District Court Awards 10x Genomics Permanent Injunction in Patent Infringement Lawsuit Against Bruker Corporation's GeoMx Products, PR Newswire (Dec. 23, 2024), https://www.prnewswire.com/news-releases/us-district-court-awards-10x-genomics-permanent-injunction-in-patent-infringement-lawsuit-against-bruker-corporations-geomx-products-302338627.html; 10x Genomics Wins Another Patent Infringement Case Against NanoString Technologies, PR Newswire (Nov. 17, 2023), https://www.prnewswire.com/news-releases/10x-genomics-wins-another-patent-infringement-case-against-nanostring-technologies-301992620.html. On information and belief, Illumina monitors patents and patent litigation events in areas of its own interests, and it did so here. Third, the Patent and Trademark Office

relied on the parent application of the 505 Patent (which published as U.S. Patent Pub. No. 2011/0245111) as a basis for initially rejecting Illumina's claims that ultimately issued as U.S. Patent No. 10,913,975 as anticipated and obvious. *See* Exhibit 11 (Excerpts of the file history of U.S. Pat. App. No. 15/747,670) at 7 (Non-Final Action at 6 (Sept. 16, 2019) (anticipation)); *id.* at 9-10 (Non-Final Action at 8–9 (obviousness)); *id.* at 18-19 (Final Action at 6–7 (Mar. 2, 2020) (obviousness)). In its responses, Illumina amended its claims to avoid Prognosys's application. *See id.* at 25-31 (Remarks (Jan. 9, 2020)); *id.* at 32-41 (Remarks (May 28, 2020)). Finally, Illumina has been aware of the 505 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 505 Patent and its infringement, and at least since the filing and service of this Complaint.

94.    Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 505 Patent under 35 U.S.C. § 271(b) by making and selling Illumina's spatial products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers (including, for example, the Broad Institute) and/or end users such as scientists working in laboratories that purchase Illumina's spatial products and/or components thereof, to use Illumina's spatial products and/or components thereof in the United States in a manner that infringes one or more claims of the 505 Patent. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 505 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of Illumina's spatial products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 505 Patent by using

Illumina's spatial products and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization.

95.     Discovery is expected to show how Illumina, its customers (such as the Broad Institute and TGen), and/or its end users perform the claimed steps of the 505 Patent in conjunction with Illumina's spatial products. Plaintiffs plead in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2) that direct infringement by Illumina customers and/or end users occurs in one or more of the following ways:

A.  An Illumina customer, by itself, performs all the recited steps of the method for determining the presence or absence of a nucleic acid at a location in a tissue as recited either literally or under the doctrine of equivalents. Thus, Illumina's customer directly infringes and, for the reasons explained above, Illumina actively induces infringement of one or more claims of the 505 Patent.

B.  An Illumina customer performs some of the recited steps of the method for determining the presence or absence of a nucleic acid at a location in a tissue while Illumina performs the others. The customer conditions benefits—including but not limited to financial benefits—on Illumina performing the remaining steps as claimed. Thus, Illumina's customer directly infringes and, for the reasons explained above, Illumina actively induces infringement of one or more claims of the 505 Patent.

C.  An Illumina customer performs some of the recited steps of the method for determining the presence or absence of a nucleic acid at a location in a tissue while Illumina performs the others. Illumina is contractually obligated to perform those

steps. Thus, Illumina's customer directly infringes and, for the reasons explained above, Illumina actively induces infringement of one or more claims of the 505 Patent.

96.    Illumina has contributed and continues to contribute to the infringement of one or more claims of the 505 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell Illumina's spatial products and/or components thereof within the United States for use by its customers (including, for example, the Broad Institute) and/or end users knowing that Illumina's spatial products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 505 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of Illumina's spatial products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or users of Illumina's spatial products and/or components thereof, directly infringe the asserted claims of the 505 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

97.    Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 505 Patent.

98.    The infringement of the 505 Patent by Illumina has been willful and deliberate, and continues to be willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 505 Patent. Such conduct constitutes, at minimum, willful infringement of the 505 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

99.     Unless Illumina is enjoined from infringing the 505 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell its spatial products and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT IV: Infringement of the 487 Patent

100.     Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

101.     The 487 Patent issued on May 13, 2025, to Prognosys Biosciences, Inc.

102.     Prognosys is the sole legal owner of the 487 Patent. A true and correct copy of the assignment abstract and record of the 487 Patent is attached as Exhibit 8. 10x is the exclusive licensee of the 487 Patent, including *inter alia* the right to sue Illumina for its acts of infringement and to recover damages therefrom.

103.     Illumina has infringed and continues to infringe one or more claims of the 487 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority Illumina's spatial products and/or components thereof. Attachment D provides an exemplary infringement claim chart for one asserted claim of the 487 Patent.

104.     Illumina is and has been aware of the 487 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 487 Patent. First, beginning in 2015, Illumina communicated with Prognosys regarding a potential license to patent rights within the family of the Asserted Patents. However, Illumina then failed to license any of these patent rights now asserted against it. Second, Plaintiffs have also engaged in prior litigation with Curio Bioscience, Inc. over patents in this family, in a case that was well-publicized in the industry. *See, e.g.,* Andrew P. Han, *10x Genomics Sues Curio Bioscience, Alleging Infringement*

of Spatial Biology Patents, GenomeWeb (Dec. 4, 2023), https://www.genomeweb.com/business-news/10x-genomics-sues-curio-bioscience-alleging-infringement-spatial-biology-patents; Blake Brittain, *10x Genomics sues rival Curio over gene-sequencing technology*, Reuters (Dec. 4, 2023) https://www.reuters.com/legal/litigation/10x-genomics-sues-rival-curio-over-gene-sequencing-technology-2023-12-04/. Similarly, Plaintiffs successfully asserted the 607 Patent from the same patent family against NanoString Technologies and its successor Bruker Spatial Biology. This lawsuit was similarly widely known in the spatial biology space. *See, e.g.*, U.S. District Court Awards 10x Genomics Permanent Injunction in Patent Infringement Lawsuit Against Bruker Corporation's GeoMx Products, PR Newswire (Dec. 23, 2024), https://www.prnewswire.com/news-releases/us-district-court-awards-10x-genomics-permanent-injunction-in-patent-infringement-lawsuit-against-bruker-corporations-geomx-products-302338627.html; 10x Genomics Wins Another Patent Infringement Case Against NanoString Technologies, PR Newswire (Nov. 17, 2023), https://www.prnewswire.com/news-releases/10x-genomics-wins-another-patent-infringement-case-against-nanostring-technologies-301992620.html. On information and belief, Illumina monitors patents and patent litigation events in areas of its own interests, and it did so here. Third, the Patent and Trademark Office relied on the parent application of the 487 Patent (which published as U.S. Patent Pub. No. 2011/0245111) as a basis for initially rejecting Illumina's claims that ultimately issued as U.S. Patent No. 10,913,975 as anticipated and obvious. *See* Exhibit 11 (Excerpts of the file history of U.S. Pat. App. No. 15/747,670) at 7 (Non-Final Action at 6 (Sept. 16, 2019) (anticipation)); *id.* at 9-10 (Non-Final Action at 8–9 (obviousness)); *id.* at 18-19 (Final Action at 6–7 (Mar. 2, 2020) (obviousness)). In its responses, Illumina amended its claims to avoid Prognosys's application. *See id.* at 25-31 (Remarks (Jan. 9, 2020)); *id.* at 32-41 (Remarks (May 28, 2020)). Finally,

Illumina has been aware of the 487 Patent and its infringement at least since October 20, 2025, when 10x notified Illumina by letter of the 487 Patent and its infringement, and at least since the filing and service of this Complaint.

105.    Illumina has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the 487 Patent under 35 U.S.C. § 271(b) by making and selling Illumina's spatial products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including Illumina's customers (including, for example, the Broad Institute) and/or end users such as scientists working in laboratories that purchase Illumina's spatial products and/or components thereof, to use Illumina's spatial products and/or components thereof in the United States in a manner that infringes one or more claims of the 487 Patent. On information and belief, Illumina provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the 487 Patent by those customers and/or end users. One or more of Illumina's customers and/or end users of Illumina's spatial products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the 487 Patent by making and/or using infringing compositions in conjunction with Illumina's spatial products and/or components thereof in accordance with Illumina's instructions and encouragement. Illumina has committed and continues to commit these acts of infringement without license or authorization.

106.    Illumina has contributed and continues to contribute to the infringement of one or more claims of the 487 Patent under 35 U.S.C. § 271(c) by selling and/or offering to sell Illumina's spatial products and/or components thereof within the United States for use by its

customers (including, for example, the Broad Institute) and/or end users knowing that Illumina's spatial products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the 487 Patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of Illumina's selling and/or offering for sale of Illumina's spatial products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to Illumina's instructions with the result that such entities, such as Illumina's customers and/or users of Illumina's spatial products and/or components thereof, directly infringe the asserted claims of the 487 Patent, literally or under the doctrine of equivalents. Illumina has committed and continues to commit these acts of infringement without license or authorization.

107.    Plaintiffs have suffered and continue to suffer damages because of Illumina's infringement of the 487 Patent. The infringement of the 487 Patent by Illumina is willful and deliberate. At least as of October 20, 2025, if not earlier, Illumina knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 487 Patent. Such conduct constitutes, at minimum, willful infringement of the 487 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

108.    Unless Illumina is enjoined from infringing the 487 Patent, Illumina's efforts to design, develop, make, market, offer to sell, and sell its spatial products and/or components thereof will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter the following relief in its favor and against Illumina:

A.  For entry of judgment that the Asserted Patents have been and continue to be directly infringed by Illumina, either literally or under the doctrine of equivalents;

B.  For entry of judgment that the Asserted Patents have been and continue to be indirectly infringed by Illumina, either literally or under the doctrine of equivalents;

C.  For entry of judgment that Illumina's infringement has been willful and deliberate;

D.  For a declaration that each of the Asserted Patents is valid and enforceable;

E.  For permanent injunctions enjoining the aforesaid acts of infringement by Illumina, its officers, agents, servants, employees, attorneys, parent and subsidiary entities, assigns and successors in interest, and those persons acting in concert with them, including related individuals and entities, customers, representatives, distributors, dealers, and end users. In the alternative, if the Court finds that an injunction is not warranted, Plaintiffs request an award of post-judgment royalty to compensate for future infringement;

F.  An award of all monetary relief adequate to compensate for damages resulting from Illumina's infringement, including lost profits but in no event less than a reasonable royalty under 35 U.S.C. § 284 for Illumina's infringement, including all pre-judgment and post-judgment interest at the maximum rate allowed by law, and damages for willful infringement;

G.  A declaration that the case is an exceptional case and that Illumina be required to pay Plaintiffs' attorneys' fees pursuant to 35 U.S.C. § 285; and

H.  A judgment awarding Plaintiffs such other and further relief as the Court may deem just, reasonable, and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues so triable.

<br>

|  |  |
|---|---|
|  | /s/ Karen E. Keller |
|  | Karen E. Keller (No. 4489) |
|  | Nathan R. Hoeschen (No. 6232) |
|  | SHAW KELLER LLP |
| OF COUNSEL: | I.M. Pei Building |
| Matthew Powers | 1105 North Market Street, 12th Floor |
| Paul Ehrlich | Wilmington, DE 19801 |
| William Nelson | (302) 298-0700 |
| TENSEGRITY LAW GROUP LLP | kkeller@shawkeller.com |
| 555 Twin Dolphin Drive, Suite 650 | nhoeschen@shawkeller.com |
| Redwood Shores, CA 94065 | *Attorneys for Plaintiffs* |
| (650) 802-6000 |  |

Azra Hadzimehmedovic
Daniel Kazhdan
Kiley White
TENSEGRITY LAW GROUP LLP
1676 International Dr., Suite 910
McLean, VA 22102
(650) 802-6000

Dated: October 21, 2025